UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

COUNCIL OF CHURCHES HOUSING
DEVELOPMENT FUND COMPANY, INC.

                                 Plaintiff

                                                           DECISION and ORDER

-vs-

                                                           18-CV-6920 CJS

ARLINGTON HOUSING CORPORATION
and BATAVIA INVESTORS, LTD.,

                                 Defendants
_____

INTRODUCTION

      This action involves a dispute over the direction and control of a limited partnership that was formed to own and operate a real estate investment. Plaintiff, the general and managing partner, commenced this action to stave off an attempt by Defendants, the limited partners, to oust Plaintiff from the partnership based on alleged breaches of fiduciary duties. Now before the Court is a motion for preliminary injunctive relief by Defendants. The application is denied.

BACKGROUND

      At issue is the operation of the Birchwood Village apartment complex in Batavia, New York. In 1970, a group of churches in Batavia formed the Plaintiff not-for-profit corporation to address a perceived need for low-income housing. To finance the development of the project, Plaintiff borrowed $4.7 million, secured by a mortgage insured by the U.S. Department of Housing and Urban Development ("HUD"). HUD subsequently became the holder of the mortgage.

      Due to HUD's involvement in the project, Plaintiff was required to operate the apartment complex in accordance with HUD regulatory agreements.[1] Such regulatory agreements

---

[1] Greenbaum Decl., Exs. 3-4.

included a provision stating: "The Owners covenant and agree that . . . [a]dmission to the project shall be limited to families having a low or moderate income which does not exceed the limits established by the Commissioner and in effect at the time of admission."[2] Such regulatory agreements further stated: "The rent charged for each unit shall not exceed the upper limit of the range shown for such type of unit on the rental schedule approved in writing by the Commissioner."[3] Such rental schedules set forth Fair Market Rents ("FMRs") for each unit. The HUD FMRs are "set at the 40th percentile in the rent distribution [for a particular community.] By definition, 60 percent of the modest (nonluxury) rental housing units in a community rent for <u>more</u> than the FMR."[4] Plaintiff, though, has always intended Birchwood Village to serve low- and moderate-income tenants even without regard to HUD's requirement that it do so.

On September 1, 1979, Plaintiff conveyed Birchwood Village to a limited partnership, Brunswick Ltd. ("Brunswick"), of which Defendant Batavia Investors, Ltd (formerly known as Essex, Ltd) ("Batavia Investors") was a limited partner. The purchase price of $5.5 million was secured by a "wraparound mortgage" that was subject to the mortgage already held by HUD.

On December 1, 1979, Brunswick's partnership agreement was amended and restated in several respects. First, the name of the partnership was changed from Brunswick Ltd to Batavia Townhouses, Ltd. Second, Plaintiff joined the partnership as co-general partner and sole managing partner. The other general partner was David C. Green, and the sole limited partner was Defendant Batavia Investors. To reiterate, upon the execution of this new partnership agreement, Plaintiff not only held the wraparound mortgage given by the partnership to secure the purchase of Birchwood Village, but it also was a co-general partner

---

[2] Greenbaum Decl. Ex. 3, p. 2.
[3] Greenbaum Decl. Ex. 3, p. 2.
[4] Docket No. [#7-6] at p. 2, ¶ 8 (emphasis in original).

2

and sole managing partner of the partnership. Additionally, and quite significantly, the partnership agreement stipulates that the partnership will dissolve automatically on December 1, 2020.

The Amended and Restated Partnership Agreement further indicates that the partnership will operate Birchwood Village as described in "Project Documents" filed with HUD. Such "Project Documents" specify that "Birchwood Village be operated as an affordable housing project for low-income residents." Complaint at ¶ 33. Paragraph 2.4 of the agreement further describes the purpose of the limited partnership as follows:

> The sole purpose and business of the Partnership shall be to acquire real property, together with the improvements thereon, as described in the Project Documents, and to own, hold, manage, maintain, and operate thereon the Project together with such other activities related directly or indirectly to the foregoing as may be necessary, advisable, or convenient to the promotion or conduct of the business of the Partnership, including without limitation the incurring of indebtedness and the granting of liens and security interests in the real and personal property of the Partnership to secure the payment of such indebtedness; all in such manner as will conform to all rules and regulations of Agency, and insofar as is consistent therewith, will maximize the Federal, state and local income tax benefits available to the Partnership. The specifications of such business shall be deemed a limitation upon the powers of the General Partner.

Complaint at ¶ 32.

In 1981, the partnership agreement was further amended, whereby David C. Green withdrew as a general partner, and Defendant Arlington Housing Corporation ("Arlington") became co-general partner with Plaintiff. Lawrence Penn ("Penn") was, and remains, a principal of both Arlington Housing Corporation and Batavia Investors.

Since at least 2000, the partnership has obtained regular audits of its financial statements, which it has shared with Defendants.[5] Additionally, since at least January 2015, Plaintiff, as general partner, has sent Defendants monthly reports concerning the rent being

---
[5] Greenbaum Decl. at ¶ 65 & Exs. 20-21.

3

charged for every unit at Birchwood Village.[6]

In 2004, the partnership agreement was again amended, to allow Arlington to withdraw as co-general partner and become a co-limited partner with Batavia Investors. Arlington was required to withdraw as general partner because its principal, Mr. Penn, had entered into a settlement agreement with HUD involving matters unrelated to this action or to Birchwood Village, which agreement prohibited him or his affiliates from serving as general partner of a partnership owning HUD property.[7] Significantly, as a result of Arlington's required withdrawal as general partner, Plaintiff became the sole general partner and managing partner in addition to holding the wraparound note and mortgage given by the partnership to purchase Birchwood Village.

As the years passed, Plaintiff, as managing partner, continued to operate Birchwood Village as it always had been operated, as an apartment complex catering to low- and moderate-income tenants. Further, as already explained, such operation was in keeping with Plaintiff's original intention when it developed the apartment complex, and was also required as a condition of the mortgage agreement between Plaintiff and HUD. It is undisputed, though, that Plaintiff, both as sole owner of Birchwood Village prior to joining the partnership, and later as managing partner, always set rents at levels that were significantly below the FMR levels permitted by HUD, purportedly to accommodate the financial means of the tenants. In other words, Plaintiff could have charged higher rents and still been in compliance with HUD's requirements.

Between 1979 and 2012, the partnership continued making payments on the note owed to HUD, but did not make any payments on the wraparound note. In 2012, the partnership paid off the HUD loan, leaving only the mortgage debt owed to Plaintiff. However, thereafter the

---

[6] Greenbaum Decl. at ¶ 67.
[7] *See, U.S. v. Rozet*, 2001 WL 348970at *8 (N.D.Ca. March 30, 2001) and Greenbaum Decl. & Exs. 13-16..

Partnership did not make payments on the outstanding wraparound note. The Limited Partners were aware of this fact. For example, the audits of the Partnership's financial statements for 2014-2017 observe that "[n]o principal payments have been made on the residual note[.]"[8]

Nor, for that matter, did Plaintiff raise the rents at Birchwood Village appreciably after the HUD loan was paid, even though the FMR restrictions previously imposed by HUD were no longer applicable.[9] That is because, Plaintiff contends, Birchwood Village was never intended to be a market-rate apartment complex, regardless of whether or not HUD imposed such restrictions.[10]

Nevertheless, since 2012, Birchwood Village has been making money ($1.6 million) for the partnership, which, for accounting reasons, has been accruing in the partnership's bank accounts, rather than being applied to the wraparound mortgage. On this point, Plaintiff's Executive Director explains:

> Interest expense on the Wraparound Note and Mortgage [in 2017] was $330,000. For 2017, the accrued interest, although owed to Churches, was not transferred as cash to Churches, but rather left to accumulate as cash in the Partnership's accounts. The interest in prior years 2016, 2015 and 2014 was accounted for in the same way.
>
> Because of the way the accrued interest on the Wraparound Note and Mortgage has been accounted for, the Partnership at December 31, 2017 had cash assets of $179,612 in its checking account, and $1,457,151 in its savings account, for a total of $1,636,763, all as reflected on the balance sheet. ... In essence, the accrued interest owed to Churches on the Wraparound Note and Mortgage has been kept in what amounts to a "sinking fund" in order to partially satisfy the Debt Obligation to Churches when the Partnership ends in December 2020.

Greenbaum Decl. at ¶ ¶ 168, 170.

As the preceding paragraph suggests, income from the operation of Birchwood Village

---

[8] Greenbaum Decl. at Exs. 20-21.
[9] Greenbaum Decl. at ¶ 154 (Indicating that the partnership was subject to the HUD Regulatory Agreements "through 2012.")
[10] Greenbaum Decl. at ¶ ¶ 156-159.

5

subsequent to the payoff of the HUD mortgage has been sufficient to only partially pay the outstanding wraparound mortgage held by Plaintiff, such that the entire amount will not be paid off by the date the partnership is set to terminate in December, 2020.

Although the limited partners have no right under the partnership agreement to direct or manage the partnership, they eventually began seeking an opportunity for the partnership to sell Birchwood Village, so as to fully satisfy the partnership's debt obligation to Plaintiff prior to the dissolution of the partnership in 2020. In October, 2014, Mr. Penn notified Plaintiff that the limited partners were interested in having the partnership sell Birchwood Village to a third party.[11] Penn stated that the limited partners "together have a 99% interest in the Partnership and consequently the negative capital account of the Partnership impacts them and their investors in a very dramatic way." Penn indicated that he had contacted various real estate investors to see if any would be interested in purchasing Birchwood Village, and that one of them, Intercoastal Capital ("Intercoastal"), was offering $8.96 million. Penn stated:

> That sum is more than adequate to pay off the wraparound mortgage, including all accrued and unpaid interest,[12] and generate funds to cover the majority of the federal tax liability the investors will owe due to their recapture of their negative capital accounts from the Partnership.

Docket No. [#7-4] at p. 9. Penn stated that Intercoastal's offer would expire if not accepted by November 30, 2014.[13] Alternatively, Penn indicated that the limited partners would be willing to sell their partnership shares to Plaintiff for the same amount that they would receive under Intercoastal's offer.

On November 13, 2014, Plaintiff notified Penn that it was not interested in purchasing

---

[11] Penn addressed his letter to Barbara Greenbaum, as Executive Directors of Birchwood Village, and indicated that the offer was being made to the "Board of Directors of the General Partner." Greenbaum Decl. Ex. 24.
[12] Penn calculated that amount to be $7,457,134.00. Docket No. [#7-4] at p. 10.
[13] *See*, Greenbaum Decl. Ex. 27 (Intercoastal's letter of intent states: "This Letter of Intent shall be null and void if not accepted by Seller by November 30, 2014.").

6

the limited partners' shares, but did not directly address Intercoastal's offer.[14] In response, on November 24, 2014, Penn's attorney, Barton L. Schuman ("Schuman"), sent a letter to Plaintiff, reiterating the wishes of the limited partners to sell the property. Schuman further implied that Plaintiff's refusal to sell would be a violation of its fiduciary duties, and threatened to dissolve the partnership pursuant to "Section 13.1 of the Agreement of Limited Partnership."[15] Schuman did not allege that Plaintiff was violating its fiduciary duties in any other respect.

On December 9, 2014, Plaintiff sent a letter to Schuman, purporting to accept Intercoastal's purchase offer. Subsequently, and even though Plaintiff's acceptance was made after the deadline in Intercoastal's offer, Schuman notified Plaintiff that Intercoastal was still agreeable to the sale, and would be preparing "a proposed Purchase and Sale Agreement for the acquisition of the Birchwood Village Apartments in accordance with the letter of Intent dated October 22, 2014," which he expected to receive in January, 2015.[16] However, on February 17, 2015, Intercoastal directly notified Plaintiff that it had decided to pursue another opportunity, and was no longer interested in purchasing Birchwood Village.[17]

On June 28, 2018, Mr. Penn, on behalf of Defendants, requested a meeting with Plaintiff, purportedly "to discuss future plans for the property." Penn did not indicate what he wanted to discuss with Plaintiff, though he suggested that the parties have "independent legal counsel" present at the meeting. Penn proposed that the meeting not take place until August, "[i]n order to provide sufficient time to coordinate all the board members' availability[.]"[18]

On August 9, 2018, a meeting was held at Birchwood Village, involving Mr. Penn and Plaintiff, at which, for the first time, Penn accused Plaintiff of violating its fiduciary duties to the

---

[14] Greenbaum Decl. Ex. 25.
[15] Greenbaum Decl. Ex. 25.
[16] Greenbaum Decl. Ex. 28.
[17] Greenbaum Decl. Ex. 30 ("In the interim between the date of our [Letter of Intent] and the response from your client which we did not receive until the second or third week of December last year, we have taken advantage of another opportunity that had been presented to us.").
[18] Greenbaum Decl. at Ex. 31.

limited partners by failing to charge tenants sufficient rent. That is, Penn accused Plaintiff of charging too little for rent, resulting in the partnership's inability to pay off the wraparound mortgage, which will eventually result in the partnership defaulting on its debt obligation to Plaintiff. Penn orally offered to pay Plaintiff $6.5 million, in exchange for Plaintiff's general partnership interest and the mortgage obligation.

On August 21, 2018, Penn's attorney sent a follow-up letter to Plaintiff, reiterating the accusation that Plaintiff had "for many years managed the Project for its advantage," "but contrary to the interests of the limited partners," by "set[ting] the Project rents substantially below the fair market value of the rental units and the level allowable under the Regulatory Agreement that the Partnership entered into with the Department of Housing and Urban Development."[19] The letter indicated that Penn was nevertheless willing to purchase Plaintiff's partnership interest for $5.5 million, which was one million dollars less than he had orally offered at the meeting.

On September 10, 2018, Plaintiff notified Penn in writing that it rejected the purchase offer, and that it considered his "accusations" to be "without merit.[20] On October 26, 2018, Plaintiff further notified Penn, by letter, that "the balance due on the Partnership's note to [Plaintiff] exceeds the value of all of the Partnership's assets," and that when the partnership terminates on the scheduled termination date, January 1, 2020, it intends "to accept all of the Partnership's assets in satisfaction of the Partnership's note."[21]

On November 19, 2018, Defendants sent a registered letter to Plaintiff, purporting to remove Plaintiff as General Partner "for cause," pursuant to Section 11.2 of the Amended and Restated Partnership Agreement.[22] On December 11, 2018, counsel for Defendants sent a

---

[19] Greenbaum Decl. at Ex. 32.
[20] Greenbaum Decl. at Ex. 33.
[21] Greenbaum Decl. Ex. 34.
[22] Greenbaum Decl. Ex. 36.

8

follow-up letter to Plaintiff, indicating that representatives of Defendants would travel to Birchwood Village on December 19, 2018, "to take control of all records of the Partnership and the Property."[23]

On December 17, 2018, Plaintiff commenced this action. The Complaint purports to state the following claims: 1) "Breach of Contract Justifying an Injunction"; 2) "Breach of contract justifying damages"; and 3) "Declaratory Judgment." The Complaint demands a permanent injunction barring Defendants from interfering with Plaintiff's right to direct and control the business of the partnership, a declaration that Plaintiff has not violated the partnership agreement or otherwise done anything giving Defendants "cause" under the agreement to remove Plaintiff as general partner, and money damages, together with attorney's fees, costs and disbursements.

On January 4, 2019, Defendants filed an answer with counterclaims, along with the subject motion for preliminary injunctive relief. The counterclaims allege, in pertinent part, that

> [b]y depressing the rents at the Property, [Plaintiff] has effectively siphoned the equity interest of the limited partners to its own account by placing itself in a position to foreclose on most or all of the Partnership's assets when the Partnership terminates in 2020.

Docket No. [#6] at p. 11. The counterclaims demand a declaratory judgment, "declaring the parties' respective rights and obligations," as well as an injunction enforcing the purported "November 19, 2018 notice of removal."

Defendants' application for preliminary injunctive relief (Docket No. [#7]) seeks a mandatory injunction "enforcing the removal of [Plaintiff]" as general and managing partner.[24] Defendants contend that they are likely to succeed in this action, since there is "cause" under the partnership agreement to remove Plaintiff as general partner:

---

[23] Greenbaum Decl. Ex. 35.
[24] Docket No. [#7-1] at p. 2.

> The evidence is irrefutable that, for many years, [Plaintiff] has kept the rents at the Property far below market level, thereby depressing the Partnership's income and precluding it from paying down the Note. Furthermore, in 2014, [Plaintiff] torpedoed [Intercoastal's] offer to purchase the property that would have paid off the Note in full and yielded more than $2 million in investment gain for the limited partners. [Plaintiff] breached its duty of loyalty and its obligation of good faith and fair dealing by taking these actions.

Docket No. [#7-1] at p. 10. Defendants also contend that they will suffer "irreparable harm if [Plaintiff] is permitted to retain control of the Partnership during the course of this litigation[.]"[25]

In support of the contention that Plaintiff has set the rents too low at Birchwood Village, Defendants have submitted, *inter alia*, an affidavit from a retired HUD employee, Stanley Houle ("Houle"), asserting that the rents being charged at Birchwood Village are, and always have been, set significantly below the HUD FMR level. In other words, Houle indicates that Birchwood Village could have charged significantly more for rents than it has charged, even when the HUD restrictions were in place prior to the payoff of the HUD loan in 2012.[26] Further, Defendants have submitted an affidavit from John E. Doyle, a real-estate appraiser, who conducted a rent comparability study which concluded that Birchwood Village was taking in $741,888.00 less annually than it could if it were charging "market rent."[27] Put differently, Doyle concluded that Birchwood Village could collect $741,888.00 more in rents annually if it charged market-rate rents rather than rents aimed at low- and moderate-income tenants.[28]

Plaintiff, however, maintains that it has not breached its fiduciary duties in any way, and

---

[25] Docket No. [#7-1] at p. 2.
[26] *See*, Docket No. [#7-1] at p. 8 ("[Plaintiff] has maintained the rents at approximately 50% of the FMRs for Genesee County from 2012 until the present.").
[27] Docket No. [#7-3]; *see also*, Docket No. [#7-1] at p. 8 ("Mr. Doyle concluded that the current market rents for comparable rental units in the same area are 48-79% higher than the rents at the Property[.]")
[28] In response to this argument, Plaintiff asserts that, "[b]ecause of its age, state of repair, need for renovations, and lack of amenities typically found in market rate apartments in the Batavia area, Birchwood Village does not and cannot attract tenants at the theoretical 'market rates' that the Limited Partners suggest should be charged," and that the Limited Partners "cannot accomplish that transformation [renovations] in the 22 months remaining before the Partnership terminates in December 2020." Docket No. [#18] at p. 12. It is evident, though, that Defendants' objective now is to sell Birchwood Village, not to transform it into a market-rate apartment complex.

that Defendants therefore cannot establish their entitlement to preliminary injunctive relief. In particular, Plaintiff contends that Defendants' arguments about market rents and mismanagement are specious, since it has always been stated in the partnership agreement and understood by the partners that Birchwood Village would be run as a low-income apartment complex, and that the primary benefit to the limited partners would be tax losses.[29] Plaintiff maintains that after decades of reaping tax benefits, and with the scheduled dissolution of the partnership looming, Defendants are now changing their tune and attempting to both "eat their cake and have it too":

> For nearly four decades, [Plaintiff] has managed the Partnership to "maximize the Federal, state and local income tax benefits available to the Partnership" as mandated by the explicit "purpose" provisions of the Partnership Agreement. During that time, the Limited Partners have been the substantial beneficiaries of the tax benefits generated by the Partnership. Now, after all these years of receiving the benefits of the Partnership's tax losses, the Limited Partners claim that [Plaintiff] should be removed as the Partnership's managing general partner because [Plaintiff] allegedly failed to fulfill a *contrary* duty to maximize income and equity.

Docket No. [#18] at pp. 1-2 (emphasis in original). Plaintiff asserts in this regard that the limited partners' total capital contribution to the partnership was only $400,000, and that for them the investment "was a classic low-income housing tax shelter, designed to generate 'tax benefits' in the form of annual operating losses that were allocated and passed through to them under the Partnership Agreement."[30] Plaintiff notes that Defendants have never complained about this arrangement until now, despite having been provided with Birchwood Villages' financial information at every step over the past forty years.

In support of its response, Plaintiff has submitted an affidavit from its accountant, Douglas Zimmerman, CPA ("Zimmerman"), explaining the purpose of the limited partnership

---

[29] Docket No. [#18] ("The Partnership was established and operated as an affordable housing tax shelter for the Limited Partners, while fulfilling [Plaintiff's] mission to provide affordable housing.").

[30] Docket No. [#18] at p. 3 ("Over the ensuing 39 years, the Limited Partners have received tax benefits of several million dollars in exchange for their $400,000 investment.").

from a tax standpoint, and the tax benefits that Defendants have received. Notably in this regard, Zimmerman states that

> 99.5% of the Debt Obligation has been allocated to the limited partner defendants, which has increased their basis in their partnership interests by almost 22 times their initial capital investment in the Partnership of $400,000, which in turn has allowed them to be allocated 99.5% of the Partnership's tax losses.
>
> The limited partner defendants have been allocated multiple millions of dollars in losses since their initial investment in the partnership in 1980, which is what they bargained for when they invested in the Partnership. Their investment in the Partnership was a tax shelter and they have received the benefit of their bargain in the form of their distributive shares of tax losses.

Docket No. [#17] at p. 4.[31] Zimmerman further states that

> [k]eeping the rental rates lower has reduced income, which has increased losses, thereby maximizing income tax benefits to the Partnership, as called for in the Partnership Agreement. Conversely, raising rental rates would increase income, which would decrease losses, thereby minimizing income tax benefits, in contravention of the Partnership Agreement.

*Id.* at pp. 4-5. Zimmerman indicates that Defendants will face income tax liability upon the dissolution of the partnership,[32] but that is the nature of the investment they made.[33]

Insofar as Defendants are contending that Plaintiff breached fiduciary duties by "torpedoing" the potential sale of the property to Intercoastal in 2014, Plaintiff responds that its alleged late response was not to blame for the potential deal falling through, that there was

---

[31] *See, e.g., Hawkins v. MedApproach Holdings, Inc.*, 326 F.R.D. 391, 393 (S.D.N.Y. 2018) ("Limited partnerships, which are taxed as 'pass-through' entities, do not pay any income tax, but instead file information returns and reports to each partner on his or her pro-rata share of all income, deductions, gains, losses, credits and other items. 2 MYRON COVE & ALVIN L. ARNOLD, REAL ESTATE TRANSACTIONS: STRUCTURE AND ANALYSIS WITH FORMS § 16:48 (2018). The partner then reports those items on his or her individual income tax return. *Id.* 'The limited partnership serves as a conduit through which the income tax consequences of a project or enterprise are passed through to the individual partners.' *Id.*")

[32] As discussed earlier, in 2014 Penn acknowledged that one of the reasons he wanted to sell Birchwood Village was because the limited partners would have "federal tax liability . . . due to their recapture of their negative capital accounts from the Partnership." Docket No. [#7-4] at p. 9.

[33] Zimmerman Decl. [#17] at p. 6 ("This prospective outcome, which is provided for in the terms of the Partnership Agreement, is the result the limited partner defendants face upon exiting the Partnership on December 1, 2020.").

never an actual purchase offer, and that any breaches of fiduciary duties occurring in 2014 are now time-barred in any event.

Plaintiff further maintains that Defendants' contention that it should be charging "market-rate rents" is not plausible, since Birchwood Village cannot realistically charge market-rate rents:

> Because of its age, state of repair/renovation, and the lack of amenities typically found in market rate apartments in our area, Birchwood Village does not and cannot attract tenants at the theoretical 'market rates' that [Defendants] suggest we could charge. ... [T]he rents [Doyle] suggests as 'estimated market rent' for Birchwood Village are completely unattainable.

Greenbaum Decl. at ¶ ¶ 149-150. Further, Plaintiff states that if Defendants were permitted to increase the rents at Birchwood Village to "market rates," "most of [the current] tenants ... would be forced to move out immediately because they would be unable to pay rents at those levels." Greenbaum Decl. at ¶ 150.

On March 28, 2019, the Court heard oral argument. At the completion of oral argument, the Court announced that it was denying the application, and that it would issue a written decision.

DISCUSSION

Defendants admittedly are requesting mandatory preliminary injunctive relief,[34] and the law governing such applications is clear:

> "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the

---

[34] In some situations there may be a dispute as to whether the injunction being sought is "mandatory." However, there is no such dispute in this action, since Movants acknowledge in their application for preliminary injunctive relief that the higher standard for "mandatory injunctions" applies, and they maintain that they meet the higher standard. *See*, Def. Memo of Law [#7-1] at p. 10 ("Where a preliminary injunction will alter, rather than maintain, the status quo, the moving party must make a clear or substantial showing of a likelihood of success. Investors and AHS satisfy that standard here.") (emphasis added; citation and internal quotation marks omitted).
13

merits of its claims to make them a fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). An injunction that would change the status quo is even more extraordinary, and parties seeking these so-called "mandatory" injunctions must show either a clear likelihood of success on the merits or, perhaps, that the balance of hardships tips even more decidedly in their favor because "extreme or very serious damage will result from a denial of preliminary relief." *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985).

*H'Sh aka v. O'Gorman*, 758 F. App'x 196, 198 (2d Cir. Feb. 13, 2019) (footnote omitted). For the reasons to be discussed below, Defendants here have not met the standard to obtain a prohibitory injunction, much less a mandatory injunction. More specifically, Defendants have not shown that they will suffer irreparable harm if the application is granted; have not shown that they are likely to succeed on the merits of the underlying claim; and have not shown that the balance of hardships tips decidedly in their favor.

<u>Irreparable Harm</u>

Irreparable harm, which is frequently called the single most important prerequisite to obtaining preliminary injunctive relief, involves considerations such as whether money damages can adequately compensate the movant if relief is not granted, and whether there is an urgent need to protect the movant:

> [I]rreparable injury, is the "single most important prerequisite." *Singas* [*Famous Pizza Brands Corp. v. New York Advertising LLC*,] 468 Fed.Appx. [43,] 45[, (2d Cir. 2012)]. .For the purposes of a preliminary injunction, the Second Circuit has defined "irreparable injury" to mean "that if [a plaintiff] is entitled to a final injunction, its interim damages cannot be calculated with sufficient accuracy to make damages an adequate substitute." *Ives Labs., Inc. v. Darby Drug Co., Inc.*, 601 F.2d 631, 644 (2d Cir.1979). Put another way, "it has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). "Thus, if it appears that the potential harm to the moving party is simply a monetary loss, the potential injury is normally not deemed irreparable and hence does not justify injunctive relief." *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir.1982).

14

> District Courts should generally consider delay in determining whether to grant a preliminary injunction. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 39 (2d Cir.1995); *see also Central Point Software, Inc. v. Global Software & Accessories, Inc.*, 859 F.Supp. 640, 644–45 (E.D.N.Y.1994) (Wexler, J.). "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff's rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Central Point Software*, 859 F.Supp. at 645 (quoting Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir.1985)). While delay does not always undermine an alleged need for preliminary relief, months-long delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion for preliminary relief.

*Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) (collecting additional cases).

In the instant action, Defendants' delay in seeking preliminary injunctive relief warrants denial of their request, even without regard to whether money damages would be adequate compensation for any injury.[35] Defendants contend that the situation which they seek to enjoin has existed "for a number of years."[36] However, Defendants are conspicuously silent about when they became aware that Plaintiff was allegedly charging too little for rent. It is undisputed, though, that Defendants have always received annual reports concerning the finances of the limited partnership, including the amounts being charged for rents at the apartment complex. Moreover, Defendants have been on notice since at least 2012, after the HUD mortgage was paid off, that no payments were being made on the remaining wraparound mortgage. Indeed, in a letter to Plaintiff dated October 24, 2014, Mr. Penn referenced the fact that the mortgage

---

[35] Defendants have alleged, but not shown, that money damages would be insufficient to compensate them.
[36] Docket No. [#7-1] at p. 1; *see also*, Docket No. [#7-2] at p. 7 ("Council has for many years managed the Property for its advantage and the advantage of the tenants of the Property, but contrary to the interests of the Limited Partners."); Docket No. [#7-6] at p. 3, ¶ 15 ("I understand that, from 2012 until the present, the rents charged at the Property have remained approximately one-half of the FMRS for Genesee County. I cannot conceive why a rational for-profit owner would set the rents so far below market level for such an extended period of time.") .

15

was not being paid.[37] However, Defendants did not request preliminary injunctive relief until January 4, 2019, and only then in response to Plaintiff's commencement of this action.

Defendants nevertheless deny that they were dilatory in making the instant application. In that regard, their reply states:

> Here [Defendants] did not sleep on their rights after learning that the rents at the Property have been suppressed far below market level. They raised this issue with [Plaintiff] at a meeting in August 2018 and then attempted to negotiate a resolution with [Plaintiff]. When that effort failed, they acted under the Partnership Agreement to remove [Plaintiff] as the general partner. Two days before the notice of removal took effect, [Plaintiff] instituted this litigation. [Defendants] promptly moved for injunctive relief when they filed their answer.

Reply [#21] at pp. 9-10. However, this argument is unpersuasive inasmuch as it relies on a very selective view of the factual record. Again, Defendants conspicuously fail to indicate exactly when it was that they claim to have "learned[ed] that the rents at the Property ha[d] been suppressed far below market level." They were, though, on actual notice of the rent level for many years, if not decades. Moreover, Defendants were plainly not in any hurry to quell this alleged severe breach of fiduciary duties by Plaintiff, since they requested the meeting with Plaintiff in June, but did not disclose the purpose of the meeting until August. Then, following that meeting and Plaintiff's rejection of Defendants' written purchase offer (which rejection could not have been a surprise to Defendants, given that the written offer was one million dollars less than what Penn had offered orally two weeks earlier), Defendants waited two more months, until November 19, 2018, to send a notice to Plaintiff, purporting to remove Plaintiff as the general partner.[38]

In sum, Defendants are requesting an injunction to effectively end a business practice of which they have been aware for years if not decades, and to which they have never objected

---

[37] Docket No. [#7-4] at p. 9 (Discussing how a sale of the property would generate sufficient funds "to pay off the wraparound mortgage, including all accrued and unpaid interest.").
[38] Reply at pp. 8-9.

16

until recently. This fact alone belies the need for the "extraordinary and drastic" remedy that Defendants are now requesting.[39]

Apart from this delay, the Court agrees with Plaintiff that Defendants' ability to establish irreparable harm depends on their ability to show that there is actual "cause" to remove Plaintiff as general partner and managing partner. That is, Defendants contend that they will be irreparably harmed if they are denied their right under the partnership agreement to remove Plaintiff for cause. However, as will be discussed further below, Defendants have not demonstrated that such cause exists. Therefore, Defendants have also failed to demonstrate irreparable harm for this reason.

<u>Clear or Substantial Likelihood of Success on the Merits</u>

Defendants have not shown that they are likely to succeed on the merits of the underlying claims. Rather, the only thing that Defendants have clearly shown is that the rents that have been charged at Birchwood Village over the years have been below both market rates and HUD's FRM rates. However, such fact is not necessarily indicative of malfeasance by Plaintiff. Indeed, Plaintiff has persuasively argued that such fact is consistent with the purpose for which Birchwood Village was established, and with the purpose of the limited partnership, which was to provide tax losses to Defendants. Defendants' contrary bald assertion that Birchwood Village should have been operated as a market-rate apartment complex once the HUD mortgage was paid in 2012, not only flies in the face of the facts of

---

[39] *See, e.g., Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005) (Reiterating the well-settled principle that a preliminary injunction "is an extraordinary and drastic remedy."); *see also, Town of Riverhead v. CSC Acquisition-NY, Inc. (Cablevision)*, 618 F. Supp. 2d 256, 266 (E.D.N.Y. 2009) ("This [four month] delay belies any claim that the alleged harms are so pressing as to warrant such a drastic judicial remedy."); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.")

record, but begs the question why they never never complained until 2018. Defendants have not provided any convincing answer to that question. Nor have Defendants otherwise shown that the purpose of the limited partnership was to maximize profits, as opposed to tax benefits.

Defendants also have not clearly shown that Plaintiff did anything improper with regard to the Intercoastal "purchase offer" in 2014. Defendants contend that Plaintiff "kill[ed] this offer to purchase" insofar as they "did not return [the letter of intent] until after the end of November when the offer had expired."[40] However, even assuming *arguendo* that such incident is not barred by the statute of limitations, for the reasons already discussed (concerning the stated purposes of the partnership) Defendants have not shown that Plaintiff was obligated to return the letter of intent at all, let alone sooner than it did. Moreover, Mr. Schuman's letter to Plaintiff of December 15, 2014, indicates that Intercoastal had received Plaintiff's letter of intent dated December 9, 2014, and was still willing to proceed with the sale. Consequently, Defendants have not clearly shown that the alleged delay by Plaintiff was the reason that the Intercoastal deal failed to materialize.[41]

For all of these reasons, Defendants have not clearly shown at this time that they are likely to succeed on the merits of this action.[42]

Serious Questions/Balance of Hardships

Defendants also have not clearly shown that there are sufficiently serious questions going to the merits of its claims to make them a fair ground for litigation, and that the balance of the hardships tips decidedly in their favor because extreme or very serious damage will result from a denial of preliminary relief. With regard to the balance of hardships, for example, if the

---

[40] Docket No. [#7-1] at p. 7.
[41] Greenbaum Decl. Ex. 28.
[42] "It is hardly necessary to add that the granting [or denial] of this relief is no indication of the court's view of the merits of the controversy, the resolution of which must await a trial." *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 416 F.Supp. 564, 570 (S.D.N.Y. 1976) (Weinfeld, J.).

application is denied the partnership will merely continue to do business as it has done for the past forty years without objection by Defendants. On the other hand, if the application is granted Plaintiff will be ousted from the position within the partnership that it has held since 1979, and the operation of the apartment complex will likely be disrupted to the detriment of the tenants.

## CONCLUSION

Defendants' application [#7][#11] for preliminary injunctive relief is denied.

SO ORDERED.

Dated: Rochester, New York
      May 3, 2019        ENTER:

                        /s/ Charles J. Siragusa
                        CHARLES J. SIRAGUSA
                        United States District Judge